OPINION AND JOURNAL ENTRY
This matter comes before us on a timely request for reconsideration filed by the City of Steubenville, Appellee in the underlying matter. Appellee asks that we reconsider that portion of our January 31, 2001, Opinion reversing the common pleas court in this administrative appeal as to the issue of whether Appellant's conduct in failing and refusing to release certain information pertaining to mandatory counseling he received constituted a neglect of duty. The administrative body found that Appellant's conduct did rise to this level. That determination was upheld on appeal by the Common Pleas Court of Jefferson County. This Court reversed the lower tribunals' findings and held that Appellant's conduct did not constitute neglect of duty. For the following reasons, we must reconsider our January 31, 2001, decision and we now overrule Appellant's assignment of error as to this issue and reinstate and affirm the decision of the common pleas court.
While Rule 26(A) of the Rules of Appellate Procedure provides a format for filing an application for reconsideration of an appellate matter, this rule provides no guidelines for determining such an application's validity. The test generally applied when determining whether an appellate decision should be reconsidered is, "whether the motion calls to the attention of the court an obvious error in its decision or raises an issue for the court's consideration that was either not considered at all or was not fully considered by the court when it should have been."State v. Wong (1994), 97 Ohio App.3d 244, 246. See also, State v.Dattilo (March 28, 2000), Mahoning App. No. 95 CA 3, unreported, 1. It is clear that such an application is not to be granted where a party merely disagrees with the court's conclusions and logic. Dattilo, supra.
While arguing other points which we will address later, Appellee's main thrust in its application is that this Court erred when it reversed the lower tribunal decisions as to whether Appellant committed neglect of duty. While not artfully couched, Appellee's argument is based on a claimed misinterpretation of our standard of review. Appellee spends a great deal of effort rearguing the facts contained within the record, which this Court has once before reviewed. Appellee does so to reiterate that the record thus contains, ". . . credible, probative, reliable and substantial evidence which the trial court relied on . . ." (Application, p. 6). It is this standard that becomes the crux of Appellee's application.
In the original Opinion issued in this matter, the Court correctly states at page four that, "[i]n administrative appeals of public employee disciplinary actions, a court of appeals may reverse a decision of the common pleas court only upon a showing that the court abused its discretion" [citations omitted]. Such a standard is correct, as far as it goes. In an administrative appeal, such as the one at bar, we are further limited in applying this abuse of discretion standard because we are to determine, from the record of the administrative tribunal and the common pleas appellate process, whether the lower court had before it some reliable, probative and substantial evidence upon which to base its decision and, further, if that decision below was in accordance with the law. Lorain City Bd. Of Edn. v. State Emp. Relations Bd. (1988),40 Ohio St.3d 257, 262. A court of appeals may not substitute its judgment for that of the common pleas court so long as some competent and credible evidence on the record supports the lower court's findings.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Unfortunately, in the original Opinion herein, we did, in fact, substitute our judgment for that of the lower court even though the court of common pleas had the requisite competent, credible evidence of record. While we may not have ruled the same way if we were that reviewing judge, necessarily, the standard of review which we must stringently follow prohibits us from this kind of decisionmaking. In that the failure to apply the correct standard was an obvious error, Appellee has met the requirements for granting a Rule 26(A) reconsideration.
In his original brief to this Court, Appellant argued in assignment of error number two that the trial court erred in finding that he "willfully refused" the release of necessary information as to his mandatory counseling session pursuant to a consent decree. Appellant's basis for this assignment was that since no official of the City of Steubenville gave him a "specific directive" as to exactly what information was to be released, his decision to allow only a release of the fact that he attended the session was sufficient. Appellant essentially argued that, because he was not given an itemized breakdown as to what information was required to be released to the City, his decision to release only the fact of his attendance cannot be seen as a willful refusal to release information.
The majority of this Court agreed with Appellant. Importantly, the majority reviewed and interpreted the decree and found that the City somehow failed in a specific duty owed to Appellant. It failed to consider that the Steubenville Civil Service Commission and the common pleas court had before them the exact same provisions of the consent decree which underlies this matter and heard the exact same testimony and relevant facts. Instead of trying to determine whether, based on these facts, the tribunals had before them competent, credible evidence supporting their decisions, the original appellate majority undertook a reexamination and reinterpretation of those facts, ultimately holding that Appellant, ". . . from his interpretation, confidently believed that mandatory counseling required he disclose only the fact that he attended the session as ordered." (Opinion, p. 9, emphasis added). In order to reach this determination, however, the majority undertook a de novo
review of the record and substituted its judgment for the lower court's. The question before us is not whether, based on the record and our interpretation of the facts, we would have ruled in the same manner as the common pleas court. The question we are to answer in every administrative appeal and were to answer in the matter before us, is whether the court's decision is supported by some evidence in the record. If so, we must affirm that decision. Only if there is no competent, credible evidence which supports the decision has an abuse of discretion occurred.
The majority, in the original Opinion, recognized that, ". . . merely providing confirmation that the session was attended does not satisfy the mandates of the Decree." (Opinion, p. 6). The majority goes on to find that other language in the decree placed some mandatory duty upon the City to fully explain each and every detail of the decree to its police officers, whether or not those officers were receptive and/or cooperative. The majority then held that the City had failed in this duty. This resulted in Appellant's failure to be notified that he was required to disclose more than mere attendance to the City. In order for us to find such a mandatory duty, however, this Court needed not only to reinterpret the decree for the parties, but to insert facts not in the record and to reinterpret the facts presented to the lower tribunals. We must find, as to the two lower tribunals did not, that the section giving the City this so-called duty was more important than, and a prerequisite to, the duties incumbent upon Appellant. Reviewing the record under an administrative appeal standard, however, reveals that there was more than enough reliable, competent evidence to support the fact that Appellant knew or should have known what was required of him regarding disclosure of information and was offered and actively avoided any further explanations by the City. Thus, there was more than enough evidence to support the determinations below, given the limited nature of our review.
Turning to the record, then, the logical place to begin a review of the matter is with Appellant's own testimony. While the administrative body may or may not accept his testimony as credible, it would be logical to begin with Appellant's own version of what occurred. However, a review of Appellant's testimony before the civil service commission is evasive and contradictory at best. The most direct exchange can be found under questioning by the City Law Director, Mr. Gary Repella:
 "Q. You are familiar with the contents of the [consent] decree?
"A. Yes, I am.
 "Q. You have read it and studied it many times; isn't that true?
"A. I have read through it many times, yes.
 "Q. You have previously stated that you understand all of the items contained in the consent decree; is that true?
"A. Yes.
 "Q. Is it still your feeling today that you understand all the items in the consent decree?
"A. I feel that I do, yes.
 "Q. Now, during your time as a Steubenville policeman you are aware of various orders directing you to contact the law director should you have any questions concerning the consent decree; is that not true?
"A. That's true.
 "Q. I'm handing you what has been marked as City Exhibit Number 8. Could you identify that, please?
 "A. It's General Order 40-97 dated September 5, 1997 to all turn commanders from the chief's office.
"Q. And could you read the last sentence of that order?
 "A. `If there is anything you don't understand or you have any questions, contact the Law Director Gary Repella.'
 "Q. Now, since the inception of the consent decree on September 3, 1997, have you ever contacted me to ask a question about the consent decree?
"A. No, I haven't.
 "Q. Now, I am handing you what has been marked as City Exhibit Number 2. Could you identify that, please?
 "A. General Order 49-98 dated May 7, 1998 to myself from Chief McCartney.
"Q. And if you could read those two paragraphs, please?
 "A. `Due to the fact that you have three complaints registered against you with the Internal Affairs Division, I am hereby ordering you to Work Care on University Boulevard for counselling. You are to report to Lou Scott of Work Care on Thursday, May 28, 1998 at 4:30 p.m. This is a mandatory appointment.'
"Q. Now, do you know why you received Order number 49-98?
 "A. I assume it's because I had three complaints against me in Internal Affairs.
"Q. Is that listed in the consent decree?
 "A. Yes, it is. It's one of many options, yes." (Tr. pp. 10-11).
* * *
 "Q. Now, do you agree that under item 66b supervisory personnel of the police department have a duty to address the types of misconduct that are alleged against you?
"A. Can you rephrase that again?
 "Q. Do you agree that under item 66b the supervisory personnel of the police department have a duty to address the types of misconduct that were alleged against you?
"A. Yes.
 "Q. Do you agree that when Chief McCartney ordered you to attend mandatory counseling your supervisors were taking a first step in addressing your problem?
"A. I would assume, yes.
 "Q. You agree that supervisory personnel have a duty to inquire into the allegations and formulate a plan to improve your job performance?
"A. Yes, and if there's a problem, yes.
 "Q. Now, item 66b, it lists some of the responses that a supervisor can take; isn't that true?
"A. That's true.
 "Q. They range from counseling, retaining, reassignment." (Tr. p. 12).
* * *
 "Q. Before your supervisors can address your alleged problem, wouldn't it be helpful for them to have the report of your mandatory counseling session in front of them so they can review it?
 "A. I can only answer that if the counselor deems there's a problem, yes, I believe they should have the information to try to rectify the problem.
 "Q. Now, you are aware that the consent decree makes a distinction between mandatory counseling and voluntary counseling?
"A. Yes.
 "Q. And is that distinction contained in item 81, if you would review it, please?
"A. Page 34. Would you like me to answer?
"Q. Yes.
"A. It does refer to both, yes.
 "Q. Is it your understanding that if you were to attend counseling on your own of your own free will voluntarily that you would enjoy confidentiality?
"A. Yes.
"Q. So you understand that distinction?
"A. If I was to voluntarily go, yes.
 "Q. And conversely, if it is mandatory counseling, do you understand that you do not enjoy confidentiality in regards to your communications with the counselor?
 "A. Not as far as the attendance, no. The City has the right to know I attended, yes.
 "Q. So it is your understanding of the consent decree that the only piece of information that can be given through your mandatory counseling is that you attended?
"A. That's correct. That's the way I read it, yes.
"Q. Now, item 70 — are you familiar with item 70?
"A. Yes.
 "Q. And do you agree that item 70 imposes a duty upon the City to maintain records documenting mandatory counseling?
 "A. Documenting the attendance as is said in the last sentence, yes.
"Q. Why don't you read item 70 to us.
"A. The whole thing?
"Q. Please.
 "A. `The city shall maintain records documenting all mandatory counseling of officers. At a minimum, these records shall reflect the name of the officer, the reason for the referral, the general subject matter of the mandatory counseling, and whether the mandatory counseling sessions were attended.'
 "Q. Would you agree that we, the City supervisors, have a duty to keep a record of the general subject matter of the counseling session?
 "A. As described in here, the general subject matter — I'm sorry. Not the matter. Just the attendance. Not the actual hearing itself, no, but of the attendance, yes.
"Q. What do you think general subject matter means?
 "A. Well, it doesn't say that in here. Those are your words, sir.
 "Q. It says here `the general subject matter of the mandatory counseling.' What do you take that to believe?
 "A. The general subject, that would be why the complaints — what the alleged complaints were and the showing up of the attending." (Tr. pp. 13-15).
Apparent from the record throughout is the fact that Appellant is very familiar with the terms of the decree, including that which required the City to have knowledge of and keep a record of the "general subject matter" of the counseling session. Equally apparent is the fact that Appellant does not want to admit to this knowledge. For the next several questions, Appellant is evasive as to the type of release he signed and when he signed it, finally admitting that he signed the requisite release of information only after his pre-termination hearing for insubordination for failing to provide said information. (Tr. p. 17). Further, Appellant tried to claim that his counselor, Mr. Lou Scott, gave him an option as to how much information to release to the City. Mr. Scott's letter to the City was presented at hearing at page 19:
 "Q. Okay. I'm handing you what has been marked as City Exhibit Number 3. Could you read the first paragraph on the second page of that letter. That would be the letter from Lou Scott addressed to me. Could you read that paragraph?
"A. The first paragraph, page two?
"Q. Yes.
 "A. `In addition I would also clarify that Mr. Guy voiced understanding that his referral and attendance to the EAP service was considered mandatory by his supervisor at the Steubenville Police Department. Mr. Guy was informed that in the case of mandatory counseling, communication with a supervisory designee making the referral was indicated and expected with his written authorization. With this condition understood Mr. Guy elected to authorize only for the disclosure of his attendance in the counseling session and expressly declined any further disclosure.'"
In later testimony, Appellant attempts to argue that while the Scott letter was accurate, Appellant believed he only needed to release the fact of attendance. This argument directly flies in the face of the information contained in the letter, however.
In fact, Scott specifically testified that he, himself explained to Appellant at the time of the counseling session that Appellant would be required to disclose certain information as to the nature of the session with the City. While obviously sensitive to the confidentiality concerns of Appellant as his patient, Scott confirmed that he advised Appellant that more information than simply a confirmation of attendance was required by the City.
At page 87 of the transcript, Scott is being questioned by a civil service commissioner:
 "COMMISSIONER KING: What did you mean then in your June 24 communication on page 2, `In addition I would also clarify that Mr. Guy voiced understanding that his referral and attendance to the EAP service was considered mandatory by his supervision at the Steubenville Police Department. Mr. Guy was informed that in the case of mandatory counseling' — was informed by whom, by you?
"THE WITNESS: Yes.
 "COMMISSIONER KING: `Mr. Guy was informed that in the case of mandatory counseling, communication with a supervisory designee making the referral was indicated . . .' What do you mean by the word `indicated'?
 "THE WITNESS: That that was the understood procedure, that was understood.
"COMMISSIONER KING: You too understood it?
 "THE WITNESS: That if I saw someone who is referred as mandatory, then the expectation and the indication was for me to give back a recommendation — an assessment and a recommendation.
 "COMMISSIONER KING: Well, that basically was part of the terms of the referral?
"THE WITNESS: Yes.
 "COMMISSIONER KING: `And expected with his written authorization.'
"THE WITNESS: Uh-huh.
BY MS. BUKOVAN:
 "Q. I guess I'm a little confused on this sentence, too, that Mr. King brought up starting with `Mr. Guy was informed.'
 "When you talk about communication with a supervisory designee, what communication, what did you mean by the word communication?
 "A. The release of an assessment and any recommendations that I had.
 "Q. And how do you characterize your June 15, 1998 letter? You've got here assessment report.
"A. Yes.
 "Q. Is that the communication that you were referring to in your second letter to Mr. Repella?
 "A. This would constitute that type of communication, yes. But under the circumstances, if you look at the content of the letter, it only addresses Mr. Guy's attendance and what the circumstances were at that point.
 "Q. And once again if I could get some clarification, did you inform him specifically that the City expected him to disclose the specifics of his hour plus session with you?
 "A. We discussed it in terms of an expectation that I provide information back to the City that included an assessment and a recommendation, but not necessarily to disclose every detail. But in those terms, assessment and recommendation.
 "Q. On that answer one final question. When he elected to only disclose the fact that he had been there, did you indicate to him that that would probably not be sufficient?
 "A. We discussed that there would be consequences that would involve — that there would be — that it wasn't what was expected and there would be a question about it." (Tr. pp. 87-89).
Thus, from the record it is apparent that, while Appellant claims he was unaware that he was required to release information as to the nature of his session with Scott, this claim is specifically rebutted by Scott, who testified that he told Appellant what was required and that there would be ramifications for his failure to release the information. At this point, it was a credibility issue whether the commission and, later, the trial court believed Appellant or Scott. In any event, a court of appeals does not make credibility determinations. It is axiomatic that we must leave these to the trier of fact, who, in this instance, believed Scott.
This conclusion is buttressed by Appellant's statements to the Law Director on cross-examination. Appellant, while stating that he fully understands the consent decree, argues as earlier stated that he understood from item 70 that he only had to release attendance information on mandatory counseling. When confronted with Scott's letter, his response is then that Scott never told him, ". . . that it was mandatory that I release everything . . . I never stated that he informed me to release everything." (Tr. p. 20). In so doing, Appellant attempts to interject an issue of "overreaching" on the part of the City. When the Law Director questions him as to what information he was told by Scott he must release, Appellant becomes confused and contradictory in his answers. At this point, the Law Director asks whether Appellant ever called to ask whether Appellant could legitimately refuse to release information. Appellant responded at page 22:
"A. No. Why would I?
 "Q. That's right. Because in your mind you understood the decree?
 "A. No. By the federal law I didn't have to release everything, but we won't go into that."
In this one last sentence, Appellant admits that it was not confusion over the terms of the decree which caused him to refuse to release information, it was his belief that he had some sort of "federal law" protection from release that caused his action. Whether or not Appellant was at any point given an explanation of the decree by any City official, and certainly the record is replete as to City attempts to so explain the decree, Appellant is a fully literate adult. He read the decree. He was explained on the day of his session about the information he was to release and he still refused, without seeking any "clarification," if he was confused and desired or needed clarification. What becomes clear from the record is that Appellant is attempting to play a game with the language of the decree in order to avoid responsibility for his own actions. The record is replete with attempts by the City to contact Appellant regarding the decree. The record reflects Appellant evaded these. Regardless, the City may not have directly discussed all of the decree's terms and conditions with any of its police employees, but it was not this failing which caused Appellant's actions and cannot be attributed to the City.
The record also reflects that Appellant had been uncooperative as regards the decree in the past. Thus, even if some duty existed on the part of the City to personally explain any or all of the decree to individual officers, the competent, credible evidence of record indicates that Appellant made fulfilling any such duty very difficult, if not impossible. In addition to the above, the City Manager, Mr. Barry Du Four, testified as follows at page 95 of the transcript:
 "Q. Now, that second disciplinary action, that was the first time that you had had problems with David regarding the consent decree?
 "A. Yes. This was a very different matter from the other. This involved the consent decree. And our requirement under the consent decree to assure that all parties, officers, those working for the police department signed off and gave clear statement they understood, read and understood the consent decree.
 "Q. Regarding that second disciplinary action, can you recall how many times that the City attempted to get David Guy to sign that he understood that decree?
"A. There were several —" (Tr. pp. 95-96).
* * *
 "A. There was an initial General Order that was signed off, as I recall, by all turns, indicating the availability of first meetings, separate meetings with the law director on follow up on another notice, an order specifically directed to Patrolman Guy as an individual to seek assistance of the law director if he did not understand the decree, et cetera. So there were several.
 "Q. And he eventually came in and signed an understanding, and at what time did he come in?
"A. At the time we held the disciplinary hearing.
 "Q. And I believe in this disciplinary action he did eventually come in and he signed a release of the information out at Trinity; is that correct?
"A. Yes.
"Q. And when did he sign that release?
"A. Once again, we were at the hearing level.
"Q. At the pre-termination hearing?
"A. Yes." (Tr. p. 97).
Further, Du Four testified that not only was Appellant uncooperative in coming in to sign that he read and understood the decree (and to seek explanation or clarification if necessary), when he finally did come in to sign, he was accompanied by his private attorney who also signed a statement to the effect that Appellant read and understood the decree. At pages 99 and 100 of the transcript, Appellant's attorney questions Du Four as follows:
 "Q. Referring your attention again to General Order 49-98, is there anything indicated on that form in addition to the order to attend the mandatory counseling that Mr. Guy was required to sign a release form and disclose all information to the City?
 "A. That is not directly referenced here except by the statement `This is a mandatory appointment.'
 "Q. So by reading that sentence, what you're saying is he should have intuitively known that that meant he was supposed to release all information?
 "A. No. You put this in perspective that — and I'm going to reflect back, if I may, to the unfortunate prior incident wherein at that time Patrolman Guy and his attorney, Bill Galloway of Weirton, as I recall, signed that he understood the consent decree. It talks about what mandatory counseling is and when the requirements therefore are. So I guess it would be presumed since he said he understood, that he would understand that language would mean."
Based on the above record, Appellant's claims that he did not know what information he was required to release because he did not understand the decree appear to be specious. The record does not reflect that Appellant could not obtain an explanation of the decree's terms if he so desired; in fact, it reflects that Appellant went out of his way to avoid such an explanation up until the time of his pre-termination hearing. Despite the mandatory nature of the language found in Item 93 of the decree requiring the City to explain all terms of the decree to all of its officers, the City cannot be expected to force feed such information to an officer who is clearly attempting to avoid it. Further, even if there is some failing on the part of the City not to pre-explain all of the decree's terms and conditions, the record is replete with evidence which, if believed, indicates that Appellant was fully explained what information he must release, understood this, and still refused to so release said information.
With regard to the duty of the City to explain the decree, the record reflects the following:
 1) The police department issued General Order Number 40-97, which stated that employees were to read the attached decree, sign the acknowledgment of receipt and return it to the police chief. The Order, signed by Acting Chief Burchfield, directed any questions regarding the terms of the decree to the law director.
 2) The police department issued a second General Order, Number 45-97, five days later. Signed by Chief McCartney, it advised employees that the law director had set up a date and time to meet with employees and answer questions or otherwise discuss the decree. This order advised employees such a meeting was voluntary, for persons who did not believe they fully understood the decree and who wanted explanations and to have questions answered.
 3) General Order Number 47-97, also signed by the Chief, was issued seven days later, reminding employees they must sign and return the acknowledgment forms and setting a mandatory deadline for their return.
 4) General Order Number 54-97, specifically directed to Appellant, was sent by the Chief approximately one and one-half months later, on October 30, 1997, ordering Appellant to sign and return his acknowledgment form. It further ordered Appellant, ". . . to contact Law Director Gary Repella by November 5, 1997, if you do not understand the Decree." This was in response to Appellant's return of an acknowledgment form on which he had crossed out that he understood the decree upon reading it. Further, it was a follow-up to direct contact by Captain Stinson of the police department with Appellant advising him that he must provide a fully completed acknowledgment form and he must seek out the advice of the law director for a review or explanation of the decree.
 5) When Appellant was unresponsive to all of the above, he was issued notification by the city manager that he was being charged with neglect of duty and insubordination for failure to satisfactorily respond. One day before his scheduled hearing, Appellant presented a fully executed acknowledgment. His hearing took place before the city manager. Appellant appeared along with private counsel and his union representative. Appellant was found to be insubordinate because he failed to carry out his direct orders within the allotted time frame.
 6) Appellant appealed this disciplinary action to the civil service commission, which found him insubordinate. In a subsequent administrative appeal to common pleas court, this finding was affirmed. Appellant did not further appeal to this Court. Thus, the determination that Appellant was insubordinate in this regard is res judicata.
All of the above provides competent, credible evidence that, to the extent the City had some duty, it did everything under its power to fulfill this duty. In its findings, in the instant action the Steubenville Civil Service Commission expressly states the following:
 "The Commission further notes that Officer Guy previously had signed-off on the Consent Order, but only after charges were filed against him for non-compliance. Against his background of previously asserting difficulty in understanding the provisions of the Consent Decree, and if he had uncertainty about the requirements related to mandatory counseling, Officer Guy should have made an inquiry of Captain Sweeney concerning the subject. Of even greater importance, upon receiving the advice and direction of Counselor Scott that mandatory counseling required a report to the referring authority, Officer Guy should have immediately contacted higher authority in the department if he continued to have doubts or reservations regarding the requirement of a report release in mandatory counseling. Absent any such action by Officer Guy, the Commission must conclude that he was satisfied with his personal interpretation of the Consent Decree, the General Order and the advice and direction of Counselor Scott, and that he would rely thereon. In the instant case, the decision was both unwise and fatal."
Upon reconsideration in light of all of the foregoing, and with due regard to the fact that the instant matter is an administrative appeal and we are charged with merely determining whether the civil service commission and court of common pleas had credible, competent, evidence upon which to base this finding, we must affirm the decision of the common pleas court. Thus, to the extent our Opinion and Journal Entry of January 31, 2001, granted relief to Appellant and reversed and remanded the trial court decision on the second assignment of error, that decision is vacated and held for naught. Instead, we affirm the trial court's decision in all respects upon reconsideration.
Appellee also asks this Court to reconsider our decision as to assignments one and three of the original Opinion, even though Appellee prevailed on those issues. Appellee takes this unique approach as part of its argument that, even if Appellee loses its argument on reconsideration of issue two, Appellee was still within its rights in terminating Appellant. In so doing, Appellee merely asks us to revisit the logic used in affirming this matter. Because we have reconsidered our determination as to issue two, we need not address this argument except to state that Appellee does not raise any obvious error in our decision or raise a matter not fully considered by this Court in our earlier decision and, thus, reconsideration is not proper as to these issues.
For all of the foregoing, we reconsider and vacate that portion of our January 31, 2001, Opinion and Journal Entry which reversed and remanded the matter in part to the common pleas court and instead, enter an Opinion and Journal Entry affirming that court's decision in all aspects. Costs to be taxed against Appellant.
Waite, J., concurs.
Donofrio, J., concurs.
Vukovich, P.J., concurs.